# NO. 12-22-00111-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE* |
| *S.A. AND R.T.,* | § | *COUNTY COURT AT LAW NO. 2* |
| *CHILDREN* | § | *ANGELINA COUNTY, TEXAS* |

## MEMORANDUM OPINION

S.T. appeals the termination of her parental rights and argues that (1) there is no evidence or factually insufficient evidence to prove beyond a reasonable doubt that continued custody of R.T. by S.T. is likely to result in serious physical or emotional damage to R.T.; (2) there is factually insufficient evidence to support a finding that termination of S.T.'s parental rights was in the best interest of the children; and (3) the trial court abused its discretion by finding that S.T.'s appointment as conservator would significantly impair the children's physical health or emotional development. We affirm.

## BACKGROUND

S.T. is the mother of S.A. and R.T. S.A.'s father is L.A.[1] and R.T.'s father is D.T.[2] On

---

[1] At the conclusion of trial on the merits, the Associate Judge found, by clear and convincing evidence, that L.A. engaged in one or more of the acts or omissions necessary to support termination of his parental rights to S.A. under subsection (E) of Texas Family Code Section 161.001(b)(1). The Associate Judge also found that termination of the parent-child relationship between L.A. and S.A. is in the child's best interest. Based on these findings, the Associate Judge ordered that the parent-child relationship between L.A. and S.A. be terminated. L.A. is not a party to this appeal.

[2] At the conclusion of trial on the merits, the Associate Judge found, by clear and convincing evidence, that D.T. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), and (O) of Texas Family Code Section 161.001(b)(1). The Associate Judge found, beyond a reasonable doubt, that (1) the Department made active efforts to provide remedial services and rehabilitation programs designed to prevent the breakup of the Indian family and that these efforts proved unsuccessful, and (2) the evidence, including testimony of a qualified expert witness, demonstrates that the continued custody of the child, R.T., by D.T., the parent, is likely to result in serious emotional or physical damage to the child. The Associate

February 26, 2021, the Department of Family and Protective Services (the Department) filed an original petition for protection of S.A. and R.T., for conservatorship, and for termination of S.T.'s, L.A.'s, and D.T.'s parental rights. The Department was appointed temporary managing conservator of the children, and the parents of each child were appointed temporary possessory conservator with limited rights, duties, access, and possession.

At the conclusion of trial on the merits, the Associate Judge found, by clear and convincing evidence, that S.T. engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b)(1). The Associate Judge found that R.T. is an Indian Child within the meaning of the Indian Child Welfare Act (ICWA). Additionally, the Associate Judge found, beyond a reasonable doubt, that (1) the Department made active efforts to provide remedial services and rehabilitation programs designed to prevent the breakup of the Indian family and that these efforts proved unsuccessful, and (2) the evidence, including testimony of a qualified expert witness, demonstrates that the continued custody of the child, R.T., by S.T., the parent, is likely to result in serious emotional or physical damage to the child. The Associate Judge also found that termination of the parent-child relationship between S.T., S.A., and R.T. is in the children's best interest. Based on these findings, the Associate Judge ordered that the parent-child relationship between S.T., S.A., and R.T., be terminated.

S.T. appealed from the Associate Judge's decision and requested a de novo hearing. After a de novo hearing, the presiding judge of the County Court at Law of Angelina County adopted the Associate Judge's report, and ordered that the Associate Judge's order be adopted as an order of the court. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.

---

Judge also found that termination of the parent-child relationship between D.T. and R.T. is in the child's best interest. Based on these findings, the Associate Judge ordered that the parent-child relationship between D.T. and R.T. be terminated. D.T. is not a party to this appeal.

1976); ***In re Shaw***, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2022); ***In re J.M.T.***, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West 2022); ***Green v. Tex. Dep't of Protective & Regulatory Servs.***, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); ***In re J.M.T.***, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2022); ***In re J.M.T.***, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; ***Wiley***, 543 S.W.2d at 351; ***In re J.M.T.***, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; ***In re J.J.***, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. ***In re J.M.T.***, 39 S.W.3d at 240.

**Standard of Review**

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. ***Glover v. Tex. Gen. Indem. Co.***, 619 S.W.2d 400, 401 (Tex. 1981); ***In re M.D.S.***, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. ***In re J.F.C.***, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. ***Id***.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. ***In re C.H.***, 89 S.W.3d 17, 25 (Tex.

2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied)

**Termination under Sections 16.001(b)(D) and (E)**

We note that S.T. does not challenge every ground upon which the fact finder could have based its decision to terminate her parental rights, specifically subsections (D) and (E). We previously have required a parent to challenge all grounds of termination before we addressed any of the grounds. *See In re A.V.*, 113 S.W.3d 355, 361–62 (Tex. 2003); *Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.–Houston [1st Dist.] 2009, no pet.). However, the Texas Supreme Court held that allowing Section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court violates the parent's due process and due course of law rights. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). In making its holding, the Court relied on subsection (M), which provides that parental rights may be terminated if clear and convincing evidence supports that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)." *Id.* at 234; TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (West 2022). As a result, the "collateral consequences of terminating parental rights under [S]ection 161.001(b)(1)(D) or (E) are significant." *In re N.G.*, 577 S.W.3d at 234.

"When a parent has presented the issue on appeal, an appellate court that denies review of a [S]ection 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." *Id.* at 235. Therefore, due process and due course of law requirements mandate that an appellate court detail its analysis in an appeal of termination of parental rights under Section 161.001(b)(1)(D) or (E) of the Family Code if a parent raises such issues. *Id.* at 237. Accordingly, in light of the Supreme Court's decision in *In re N.G.*, we will consider the legal and factual sufficiency of the evidence to terminate S.T.'s parental rights pursuant to

4

subsections (D) and (E) of Texas Family Code Section 161.001(b)(1), even though she does not challenge termination under those subsections.

**Applicable Law**

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West 2022). Subsection (D) addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775-76 (Tex. App.—Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (West 2022). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied), overruled on other grounds, *In re L.C.L.*, 599 S.W.3d 79, 85-86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. When seeking termination under subsection (D), the Department must show that the child's living

conditions pose a real threat of injury or harm. *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well-being. *Ybarra*, 869 S.W.2d at 577-78. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *In re N.R.*, 101 S.W.3d at 776. In other words, conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.), overruled on other grounds, *In re L.C.L.*, 599 S.W.3d. at 86-86. We have previously concluded it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, is not inherently a part of the "conditions and surroundings" of that place or home. *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). Subsection (D) is designed to protect a child from precisely such an environment. *Id.*

Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children. *See id.* (stating that although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is

appropriate). Further, the conduct may occur before the child's birth and both before and after the child has been removed by the Department. ***Walker v. Tex. Dep't of Family & Protective Srvs.***, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

A parent's use of narcotics and its effect on her ability to parent may qualify as an endangering course of conduct. ***In re J.O.A.***, 283 S.W.3d 336, 345 (Tex. 2009); *see also* ***In re R.W.***, 129 S.W.3d at 739. Further, evidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being. *See* ***In re M.E.-M.N.***, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); ***Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.***, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under subsection (E). ***Walker***, 312 S.W.3d at 617-18.

Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. ***In re T.R.L.***, No. 10-14-00290-CV, 2015 WL 1020865, at *5 (Tex. App.–Waco Mar. 5, 2015, no pet.) (mem. op.); ***In re C.J.O.***, 325 S.W.3d 261, 265 (Tex. App.–Eastland 2010, pet. denied) (holding domestic violence may be considered evidence of endangerment supporting findings under (D) and (E)). Criminal acts that also constitute domestic violence need not lead to indictment or conviction in order to be considered under the family code. ***In re R.S.***, No. 01-18-00058-CV, 2020 WL 3393069, at *8 (Tex. App.–Houston [1st Dist.] June 18, 2020, no pet.) (mem. op.). A court may consider a parent's failure to complete a service plan as part of the endangering conduct analysis. ***In re M.B.***, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.–Fort Worth July 16, 2015, no pet.) (mem. op.); ***In re T.H.***, No. 07-07-00391-CV, 2008 WL 3351948, at *7–8 (Tex. App.–Amarillo Aug. 12, 2008, no pet.) (mem. op.).

### TERMINATION UNDER THE INDIAN CHILD WELFARE ACT (ICWA)

In her first issue, S.T. argues that the evidence is legally and factually insufficient to prove beyond a reasonable doubt that continued custody of R.T. by S.T. is likely to result in serious physical or emotional damage to R.T.

### Burden of Proof

Subsection (f) of the Indian Child Welfare Act (ICWA) provides "[n]o termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C.A. § 1912(f) (Westlaw current through PL 117-214). However, subsection (d) provides that a party seeking to terminate parental rights "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." *See* 25 U.S.C.A. § 1912(d) (Westlaw current through PL 117-214). Active efforts include, for example:

(1) Engaging the Indian child, the Indian child's parents, the Indian child's extended family members, and the Indian child's custodian(s);

(2) Taking steps necessary to keep siblings together;

(3) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

(4) Identifying, notifying, and inviting representatives of the Indian child's tribe to participate;

(5) Conducting or causing to be conducted a diligent search for the Indian child's extended family members for assistance and possible placement;

(6) Taking into account the Indian child's tribe's prevailing social and cultural conditions and way of life, and requesting the assistance of representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards;

(7) Offering and employing all available and culturally appropriate family preservation strategies;

(8) Completing a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

(9) Notifying and consulting with extended family members of the Indian child to provide family structure and support for the Indian child, to assure cultural connections, and to serve as placement resources for the Indian child;

(10) Making arrangements to provide family interaction in the most natural setting that can ensure the Indian child's safety during any necessary removal;

(11) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or extended family in utilizing and accessing those resources;

(12) Monitoring progress and participation in services;

(13) Providing consideration of alternative ways of addressing the needs of the Indian child's

parents and extended family, if services do not exist or if existing services are not available;

(14) Supporting regular visits and trial home visits of the Indian child during any period of removal, consistent with the need to ensure the safety of the child; and

(15) Providing post-reunification services and monitoring.

*See* BUREAU OF INDIAN AFFAIRS GUIDELINES FOR STATE COURTS AND AGENCIES IN INDIAN CHILD CUSTODY PROCEEDINGS, 80 FED. REG. 10146-02, 10150 (February 25, 2015).

## Standard of Review

The beyond a reasonable doubt standard has traditionally been regarded as the decisive difference between criminal culpability and civil liability. *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 2787, 61 L. Ed. 2d 560 (1979) (citations omitted). When we review the sufficiency of the evidence pursuant to the ICWA burden of proof requirements, we must determine whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found that the requirements of Section 1912(d) and (f) were satisfied beyond a reasonable doubt. *See id.*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (legal sufficiency review of cases involving termination of parental rights requires the reviewing court to consider all of the evidence, not just evidence favoring the verdict). This standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

S.T. challenges the factual sufficiency of the evidence supporting the ICWA grounds, but Texas no longer applies a factual sufficiency review to challenges of evidence requiring proof beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010) (holding that factual sufficiency standard is indistinguishable from the *Jackson v. Virginia* legal sufficiency standard). Accordingly, we apply the *Jackson v. Virginia* standard in reviewing the sufficiency of the evidence supporting termination under the ICWA. *In re K.S.*, 448 S.W.3d 521, 539 (Tex. App.—Tyler 2014, pet. denied).

## Preventive Measures and Expert Testimony Required

When a state seeks to terminate the parental rights of an Indian child, it must prove beyond a reasonable doubt that (1) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful, and (2) the continued custody of the child by the parent or

Indian custodian is likely to result in serious emotional or physical damage to the child. *See* 25 U.S.C.A. §§ 1912(d), (f), 1914 (Westlaw current through PL 117-214). Whether continued custody of the child by the parent or Indian custodian is likely to result in physical or emotional damage to the child must be supported by evidence that includes testimony from a qualified expert witness. *See* 25 U.S.C.A. § 1912(f).

**Analysis**

This case began in January 2021 when Martha Williams, a Department investigator, testified that she investigated a case involving S.A. and R.T., their mother, S.T., and R.T.,'s father, D.T. The Department received a report alleging concerns for the safety and well-being of the children and ongoing domestic violence on the part of D.T. towards S.T., as well as concerns that S.T. and D.T. used methamphetamine around the children and that the domestic violence had escalated. Williams and an officer of the Hudson Police Department went to S.T.'s and D.T.'s house and introduced themselves. According to Williams, S.T. was very aggressive, yelling, screaming, and cursing at her and the officer. S.T. and D.T. allowed Williams and the officer to enter the home. During that time, the officer asked S.T. to calm down and cooperate. When Williams attempted to interview S.T., she was yelling, screaming, and cursing at both Williams and the officer. S.T. finally calmed down, and Williams interviewed S.T., D.T., and all the household members. She informed S.T. and D.T. that they needed to drug test for the Department, but S.T. and D.T. refused. Williams could not recall if the children were present that day.

After Williams's interviews, the Department initiated a safety plan with S.T. and D.T. to ensure the children were safe, which included the requirement that neither parent be left unsupervised with the children. S.T. and D.T. were also told that they could not spend the night at the house. The children would remain in the home with caregivers. Everyone agreed to the safety plan and it went into effect on February 6, 2021. S.T. and D.T. agreed to be drug tested and both tested positive for methamphetamine. Williams stated that the children were unsafe because both parents tested positive for methamphetamine.

S.T. and D.T. also violated the safety plan by staying in the house all day and all night, and the caregivers were not being protective of the children. Williams and a caseworker from the family-based services division went to the home for an assessment on February 22, 2021. When they arrived, Williams heard S.T. cursing and yelling at them. Although they were invited inside,

S.T. was "very rude," yelled, and refused to cooperate or listen. Williams and the caseworker determined that the children needed to be removed because the safety plan had been violated. The children were removed and placed in foster care. According to Williams, S.T. knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being.

*Family Service Plan.*

Dah-Mairi Scroggins was S.A.'s and R.T.'s caseworker. Upon receiving the case, Scroggins created a family plan of service with S.T. and D.T. and reviewed the plan with them. She also contacted the children's foster family, went to see the children, and created a child plan for them. Scroggins stated that S.T. was required to maintain stable housing and a stable income, obtain a psychosocial assessment, an ADAC assessment, and an assessment with the Burke Center, and participate in couples counseling with D.T. and individual counseling for anger.

According to Scroggins, S.T. completed a "majority" of her family plan of service. However, she noted that S.T. stopped her counseling from October to December 2021. Before January 2022, S.T. and D.T. had a stable home, but Scroggins did not believe it was appropriate for the children. Scroggins stated that initially, both D.T. and S.T. tested positive for methamphetamine. Since then, S.T. has been drug tested monthly, always negative.

To Scroggins's knowledge, S.T. has not had any contact with D.T. since she left him and filed a protective order against him. S.T. recently obtained her own house, a three-bedroom, two bath home. Scroggins stated that is appropriate for the children and is close to S.T.'s brother. However, S.T. only moved into the home approximately one to two months before trial. S.T. is also working at Wal-Mart and has reliable transportation. But Scroggins did not know how much time it would take to feel confident that S.T. would protect the children from D.T. She also had concerns about the family violence between S.T. and D.T., S.T.'s anger, and the stability of S.T.'s home.

Scroggins believed that at the time of the children's removal, S.T. knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical and emotional wellbeing. Ongoing violence between S.T. and D.T. was one of the problems identified in the service plan. Both S.T. and D.T. participated in couples counseling, completing six sessions before November 2021. Because they were still fighting, the Department ordered additional family counseling. According to Scroggins, the family plan of service is not a

11

checklist, but S.T. had to demonstrate that she learned from the service plan. S.T. did not demonstrate that she learned from counseling because she and D.T. were still fighting in November and December 2021. Scroggins stated that S.T. failed the service plan in that instance.

There were three domestic violence incidents between the couple: November 11, 2021, November 13, 2021, and December 25, 2021. Scroggins did not learn of these incidents until close to the new year. Neither S.T. nor D.T. had reported the incidents. In the October 2021 group conference, Scroggins advised S.T. to go to the Family Crisis Center, but after visiting the Center, S.T. determined that she did not need the Center's help. She again received this opportunity in November 2021. Because the investigator had asked D.T. to leave the home, Scroggins did not believe it was S.T.'s decision to require D.T. to leave their home. S.T. was still defending him and wondering why he could not be in the home.

S.T. testified that she has stable employment, having worked at Walmart since May 2021. S.T. completed an ADAC evaluation, a psychosocial assessment, and couples and individual counseling. She did not tell the Department about the November and December incidents because she was scared for her life. She has not had contact with D.T. since December 2021. S.T. admitted that the children witnessed their fighting and drug usage. S.T. denied the children were at risk with her and D.T. She denied that her drug use affected the children even though she used methamphetamine in their presence. However, S.T. agreed that this conduct could endanger the children's safety and wellbeing.

*S.T.'s Anger Issues.*

According to Scroggins, S.T. cannot get along with other people and has poor communication skills. If the caregivers attempted to schedule a meeting between S.T. and her children, Scroggins stated that it would be toxic because S.T. would focus on something that the caregivers are doing wrong and "blow the whole meeting out of proportion." S.T. "cusses them out" and does not care who is around when she does so.

Scroggins recalled a group conference seven or eight months previously when S.T. "blew up" on the attorney ad litem, calling him names. She agreed that S.T. had a violent temper and had been unable to change her behavior even though she attended treatment centers and counseling. Tyra Labette Risby, the CASA representative, also expressed concern about S.T.'s anger and impulse control. She called S.T. in October 2021 about one of her children and S.T. "went off" on Risby and asked that she not call back. Risby further had concerns about S.T.'s

stability, permanency, and safety. She was present when S.T. "lit into" the attorney ad litem.

Susan Favor, the program director for CASA, admitted that S.T. may have an anger problem. Favor also stated that there may be some evidence that S.T. has been back with D.T. since the trial, but she was not aware that S.T. and D.T. were together again.

*Domestic Violence.*

As noted previously, there were three incidents of domestic violence that occurred after the case began: November 11, 2021, November 13, 2021, and December 25, 2021.

Lufkin Police Officer Reagan Jordan testified that on November 11, 2021, she was dispatched to an assault in progress, which alleged that D.T. was intoxicated and attempting to assault several members of the household. When she arrived, Jordan made contact with the parties, including Kelly Allen, the caller, Gregory Davis, a member of the household, S.T., and D.T. Jordan described S.T. as distraught, having been involved in some kind of disturbance and having some red marks on the left side of her face and cheek and a small knot above her eyebrow that appeared to be swelling.

S.T. told Jordan that she was in the bedroom and D.T. was drinking and very intoxicated. At one point, D.T. became very upset and began yelling. He told S.T. to "go die." A verbal disturbance ensued, during which D.T. began aggressively advancing towards S.T. and getting in her face. S.T. said that she began to "kind of hit him" to get him out of her face and then D.T. began assaulting her. S.T. stated that D.T. struck her with his knee while she was on the floor. D.T. left and created a disturbance with Davis before going out to the porch. According to Davis, D.T. struck him in his right ear with a closed fist. Jordan stated that D.T. was very intoxicated, was vomiting, and smelled of alcohol. D.T claimed that they were just arguing, denied that anything physical occurred, and described everyone in the house as "snitches." Based on S.T.'s appearance and statement, Jordan stated that D.T.'s denial was not credible. Jordan arrested D.T. for two counts of causing bodily injury to a family member, including S.T. and Davis.

Lufkin Police Officer Christopher McClurg stated that he also responded to the November 11, 2021, call involving D.T. He further responded to a domestic disturbance call involving S.T. and D.T. on November 13, 2021. Dispatch stated that an intoxicated man was in the house, was throwing things, and was attempting to assault people. Further, dispatch informed McClurg that the caller and other persons barricaded themselves in a room to separate themselves, but the male subject was trying to break into the room. When McClurg arrived, he

met Allen who stated that an intoxicated D.T. came in the house and began breaking things. Allen stated that D.T. threw a lamp at her and the lamp hit her. McClurg arrested D.T. for assault, family violence, Class C, because Allen was his roommate.

Jordan responded to a third call involving S.T. and D.T. on December 25, 2021, early Christmas morning. The caller was again, Allen, who advised dispatch that D.T. was assaulting S.T. and pulled a gun on her. When Jordan arrived, several family members were in the yard. The officers retrieved the gun and secured it, discovering that it was a BB gun, not a rifle. Jordan found S.T. was sweeping the house and her demeanor was different from the first incident. S.T. did not want to talk to Jordan, but Jordan noticed a small amount of dried blood near S.T.'s upper cheek and questioned S.T. about the blood. S.T. told Jordan not to worry about it, but stated that she arrived home from work to find D.T. intoxicated. D.T. locked S.T. out of the bedroom and she had to call Allen to "muscle" the door open. After S.T. gained access to the bedroom, D.T. began striking her multiple times in the face, causing her to have a small scratch to the face. Jordan said that at some point during the argument, D.T. picked up a BB gun. S.T. said she knew it was a BB gun and was not afraid of or threatened by the gun. Jordan spoke to D.T. who, again, stated that the argument was verbal and that nothing physical occurred. Jordan again placed D.T. under arrest for assault, family violence.

After each incident, Jordan gave S.T. victim information, known as a "blue form," which outlined services for victims of domestic violence, including information regarding the Crime Victims Compensation Act, and telephone numbers to the police department, Salvation Army, and women's shelters. McClurg stated that during the November 11, 2021, call, S.T. told him that she was under investigation by the Department and trying to get D.T. out of the house. He instructed her on what she needed to do to get him out.

S.T. admitted that she did not inform the Department of these incidents until the end of December 2021. According to the paternal grandmother, S.A. has told her about family violence such as verbal abuse, yelling, cussing, and whippings, not spankings, or aggressive types of punishment by both D.T. and S.T.

Jane Wojansinski, a licensed professional counselor, stated that S.T. began individual counseling in August 2021. She has seen progress in S.T. and testified that she exhibits a lot of the characteristics of someone who has been a victim of family violence. In January 2022, S.T. talked about getting a protective order and not living in the same house as D.T. She has seen

increased improvement in her confidence and ability to be independent of D.T., and to maintain healthy boundaries with anyone she brought around her children. According to Wojansinski, S.T. stated that she struggled with not reporting a December 2021 incident because she feared that D.T. would retaliate against her. She was afraid to make choices that could have ramifications from him. Wojansinski was concerned that S.T. did not report the incidents of domestic violence in November or December 2021. S.T. denied physically abusing her children.

*Abuse Allegations.*

There was an allegation by S.A. that D.T. attempted to drown her. Jessica Carlisle, a forensic interviewer at the Children's Advocacy Center, testified that she interviewed S.A., who was approximately ten years old, on January 3, 2022. According to Carlisle, there was an allegation of physical abuse and the alleged perpetrator was D.T. Carlisle said that S.A. told her that one day when she was six years old and her siblings were on the couch asleep, they were instructed to go to bed. S.A. admitted that she was reluctant to go to bed, did not listen, and did not want to go. However, she was instructed by D.T. to go take a bath. When S.A. was in the bathtub, she called out for D.T. to bring her shampoo and conditioner and he did so. Then, she stated that D.T. was sitting on the toilet watching her and became angry. S.A. stated that D.T. attempted to drown her in the bathtub. S.A. kept trying to come up from the bathwater to breathe, but he continuously shoved her head back under the water. D.T. stopped when S.T. came home. He told S.A. not to tell anyone what had happened. She said that D.T. told her something would happen if she were to tell but she could not remember what that was.

According to Carlisle, S.A. was consistent with the facts that Carlisle knew at the time and during her outcry. Carlisle stated that S.A. did not seem emotional or upset. When Carlisle asked S.A. if she told an adult, she stated that she told "Grandma."

S.A.'s paternal grandmother testified that she is L.A.'s mother and lives in Michigan. According to the paternal grandmother, S.A. told her something "very disturbing" about D.T. during Christmas 2021. As they were Christmas shopping, S.A. asked her if she could tell her something, but she would have to promise not to cry. She told the paternal grandmother that "[D.T.] tried to kill me, he tried to drown me." S.A. stated that S.T. was not home, her sister was asleep in her room with D.T., and she was lying down in the living room. D.T. wanted her to take a bath, but she did not want to do so. However, eventually, she went to the bathroom and D.T. pushed her head under water; she tried to get up, but he kept pushing her head under water.

He stopped when S.T. came home and told S.A. not to tell anyone what had happened. S.A. said this happened not long before she was removed from the house.

S.T. did not believe the alleged attempted drowning occurred because D.T. was asleep at the time. She did not believe anything happened and does not believe it is a credible allegation. She did not know about it until trial, nor did she know about any alleged sexual abuse. At the de novo hearing, S.T. stated that she now believes the allegations, but still did not find the incident credible.

*Qualified Expert Witness.*

Rebecca Turner, the Indian Child Welfare social worker for the Choctaw Nation of Oklahoma, is a qualified expert witness (QEW) designated by the Choctaw Nation of Oklahoma to testify on behalf of the tribe and regarding the ICWA. The Associate Judge certified Turner as an expert witness. According to Turner, R.T. is an enrolled member of the Choctaw Nation of Oklahoma. She has discussed this case with the Department caseworkers and reviewed the legal documents in the case, including the original removal affidavit, the permanency reports, police reports, CASA reports, conduct reports from the foster home, and emails from Scroggins. Based on her involvement with the case, she stated that active efforts were employed to prevent the breakup of the family. At the time of the initial removal of the child, D.T.'s and S.T.'s behaviors were not consistent with culturally appropriate parenting among the Choctaw Nation of Oklahoma, including the physical abuse and drug use. From her understanding, both parents were contributors to the domestic violence. She was not aware of any physical damage that S.T. ever inflicted on R.T.

Turner has been on the case since May 2021 and attended most, if not all, the hearings. She believed returning R.T. to S.T. would likely result in serious emotional or physical damage to her. She did not believe that S.T. corrected the safety concerns related to her anger issues, or the domestic violence between the couple, and her contribution to that violence. According to Turner, those safety concerns have not been alleviated. In the anger management portion of the service plan, Turner stated that S.T. admitted to contributing to the domestic violence. If S.T. did not get a protective order until January 2022, after three incidents of domestic violence, Turner did not believe S.T. could protect R.T.

At the de novo hearing, Turner expressed concerns that S.T. is having an ongoing relationship with D.T. and still has anger management issues. According to Turner, D.T.'s

relatives stated that S.T. and D.T. continued to spend the night together, are in a relationship, and that S.T. apologized to him for filing the protective order.

**Conclusion**

From the above evidence, a reasonable fact finder could have formed a firm belief or conviction that S.T. used methamphetamine around the children before they were removed, had anger issues, acknowledged three domestic violence incidents after the case began, and did not report those incidents to the Department. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The trial court could have also determined that S.T. did not believe or find credible S.A.'s allegation that D.T. attempted to drown her and could have returned to a relationship with D.T. after the trial. *See id.* Therefore, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that S.T. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well being of the children, and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well being of the children. *See **In re J.F.C.**,* 96 S.W.3d at 266.

Although S.T. was no longer using illegal drugs, and had a home and employment, she did not believe that her children were harmed by her drug use and she only left D.T. and obtained a home a mere one to two months before trial. This evidence is not so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed a firm belief or conviction that S.T. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well being of the children, and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well being of the children. *See **In re C.H.**,* 89 S.W.3d at 25. Therefore, we hold that the evidence is legally and factually sufficient to support termination of S.T.'s parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b). *See* TEX. R. APP. P. 47.1.

Further, having viewed the evidence in the light most favorable to the verdict, we conclude that the Department proved beyond a reasonable doubt that (1) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the efforts proved unsuccessful, (2) that the continued custody of

R.T. by S.T. is likely to result in serious emotional or physical damage to R.T., and (3) that the finding is supported by testimony by an expert witness. *See* 25 U.S.C.A. §§ 1912(d), (f); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. We overrule S.T.'s first issue.

## BEST INTERESTS OF THE CHILD

In her second issue, S.T. argue the evidence is factually insufficient to support a finding that termination of her parental rights is in the children's best interest. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the

best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. ***In re D.M.***, 58 S.W.3d at 801. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. ***In re M.R.J.M.***, 280 S.W.3d at 507. But the presence of scant evidence relevant to each factor will not support such a finding. ***Id.*** Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See **In re C.H.**,* 89 S.W.3d at 28-29. We apply the statutory and ***Holley*** factors below.

**Analysis**

As noted above, S.T. had anger issues, was dismissive of the effects of her drug use around the children, did not inform the Department of three incidents of domestic violence with D.T. during the case, did not believe that S.A.'s allegations against D.T. were credible, and may have returned to D.T. after the initial trial. The evidence also shows that Scroggins stated that the couple has been fighting throughout the entire case, even when the Department attempted to provide them with help and additional counseling. The Department tried to get S.T. to go to the Family Crisis Center to obtain help. However, Scroggins said, S.T. and D.T. were "adamant" that they were not fighting even though D.T. had been arrested.

Scroggins stated that if the parental rights of both parents are terminated, S.A. will live with her paternal grandmother in Michigan. At the time of the de novo hearing, the paternal grandmother's home had been approved by the State of Michigan. The Department is also in contact with an aunt and uncle in Oklahoma for a possible placement for R.T.. These possible placements are Native American, as R.T. is an "Indian" child pursuant to ICWA.

S.T. said that S.A. wanted to go to her paternal grandmother's house if she could not go home to her mother. Scroggins believed it was significant that S.A. made an outcry to her paternal grandmother in December 2021, but not her mother. Scroggins believes S.A. would be safe with her paternal grandmother in Michigan.

According toRisby, the CASA representative, she has met and conversed with the paternal grandmother virtually and believes that it would be a safe and stable home. Risby went to see S.T.'s new home the day before trial and stated that it was appropriate. She was concerned that the children receive safety, permanency, and stability. Risby found it "very significant" that S.A. made an outcry to her paternal grandmother and not her mother, stating that she could have felt secure and unthreatened. Scroggins and Risby believed that it was in the best interest of the

19

children for S.T.'s parental rights to be terminated.

Michelle Smith, a foster care specialist with Children's Hope, testified that she began working with S.A. and R.T. between June 2021 and August 2021. She made monthly visits to the foster home and interviewed them at each visit. Smith stated that the children adjusted to the home and were doing great although there were some behavioral issues. The children reported that they loved the foster home, felt safe at the foster home, and were doing well and happy. Smith stated that the children seemed to be thriving, happy, and healthy. She stated that the children did not express a desire to see their parents.

According to S.A.'s paternal grandmother, L.A. is incarcerated in Texas. S.A. is ten years old and the grandmother wishes to adopt her. The paternal grandmother stated that she was at the hospital when S.A. was born and S.A. spends every summer with her. She stated that she and S.A. have a very good relationship. The paternal grandmother has a clean house, room, bed, and toys for S.A. The paternal grandmother believed it was in S.A.'s best interest for L.A.'s and S.T.'s parental right to be terminated.

Turner stated that the children are in a traditional foster care placement and the Department is actively seeking an ICWA-compliant placement for R.T. in Oklahoma. She believes that it would be in R.T.'s best interest for S.T.'s parental rights to be terminated for the child's safety.

Although some evidence might weigh against the finding, such as S.T. having a current stable home and employment, this evidence is not so significant that a reasonable fact finder could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating S.T.'s parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule her second issue regarding best interest.

### CONSERVATORSHIP

In her third issue, S.T. argues that the trial court abused its discretion by finding that her appointment as conservator would significantly impair the children's physical health or emotional development.

We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or

20

unreasonable. ***In re J.A.J.***, 243 S.W.3d 611, 616 (Tex. 2007). Courts have previously held that when evidence is sufficient to terminate parental rights, a trial court does not abuse its discretion in appointing the Department as the child's managing conservator. *See **Interest of T.N.R.***, No. 14-21-00473-CV, 2022 WL 370035, at *7 (Tex. App.—Houston [14th Dist.] Feb. 8, 2022, no pet.) (mem. op.). Because the trial court terminated S.T.'s rights to the children, and we hereby affirm that decision, we cannot say that the trial court abused its discretion in appointing the Department as the children's permanent managing conservator. Accordingly, we overrule S.T.'s third issue.

## DISPOSITION

Having overruled all of S.T.'s issues, we ***affirm*** the judgment of the trial court.

**GREG NEELEY**
Justice

Opinion delivered October 31, 2022.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

21



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**OCTOBER 31, 2022**

**NO. 12-22-00111-CV**

**IN THE INTEREST OF S.A. AND R.T., CHILDREN**

Appeal from the County Court at Law No. 2
of Angelina County, Texas (Tr.Ct.No. CV-00837-21-02)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*